

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Morton Denlow | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 2060 | **DATE** | 2/12/2004 |
| **CASE TITLE** | Harper, et al. vs. Wilson, et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]  Enter Memorandum Opinion and Order. Judgment is entered in favor of Defendants, Robert Wilson, Tammy Wilson and Professional Protection Specialists, L.L.C., and against Plaintiff, Sabrina Harper on all of her claims in her amended complaint. Judgment is entered in favor of Plaintiff, Otis Emerson, and against Defendants Robert Wilson, Tammy Wilson, and Professional Protection Specialists, L.L.C. in the amount of $1,340.00 for his claim for overtime pay, and in favor of Defendants and against Plaintiff, Otis Emerson, for his claim of retaliatory discharge in the amended complaint. Each party shall bear it own court costs.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | | |
|---|---|---|---|---|---|
| | No notices required. | | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | | FEB 13 2004 | |
| | Notified counsel by telephone. | | | date docketed | |
| | Docketing to mail notices. | | | | |
| | Mail AO 450 form. | | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | 2/12/2004 | |
| | | | | date mailed notice | |
| DK | courtroom deputy's initials | | | DK | |
| | | | Date/time received in central Clerk's Office | mailing deputy initials | |

Document Number

18

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION



DOCKETED
FEB 1 3 2004

| | |
|---|---|
| SABRINA HARPER<br>and OTIS EMERSON, | ) <br> ) <br> ) |
| Plaintiffs, | ) Case No. 03 C 2060 |
| v. | ) Magistrate Judge Morton Denlow |
| ROBERT WILSON, TAMMY WILSON<br>and PROFESSIONAL PROTECTION<br>SPECIALISTS, L.L.C., | ) <br> ) <br> ) <br> ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

The Court conducted a two-day bench trial on January 14 and 15, 2004, to consider the claims of Sabrina Harper ("Harper") and Otis Emerson ("Emerson") (collectively "Plaintiffs") against Robert Wilson ("Mr. Wilson"), Tammy Wilson ("Mrs. Wilson") and Professional Protection Specialists, L.L.C., ("Protection") (collectively "Defendants") for overtime pay, unpaid wages and retaliatory discharge under the federal Fair Labor Standards Act ("FLSA"), the Illinois Wage Payment and Collection Act and the Illinois Minimum Wage Law. The Court has carefully considered the testimony of the six witnesses who appeared at trial, the exhibits introduced into evidence, and the closing arguments of counsel. The following constitute the Court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure. To the extent certain

18

findings of fact may be deemed conclusions of law, they shall also be considered conclusions of law. Similarly, to the extent matters contained in the conclusions of law may be deemed findings of fact, they shall also be considered findings of fact.

## I. ISSUES PRESENTED

This case raises the following issues regarding Harper's claims:

1) Whether Harper began work the week of December 9, 2002, or the week of December 16, 2002. Answer: The week of December 16, 2002.

2) Whether Harper was a salaried or an hourly employee. Answer: Salaried.

3) Whether she worked more than 40 hours per week during her employment with Defendant. Answer: No.

4) Whether she was an employee or an independent contractor. Answer: Employee.

5) If she was an employee, whether she was exempt from overtime because she was an executive or an administrative employee. Answer: She was exempt as an executive employee.

This case raises the following issues regarding Emerson's claims:

1) Whether he was compensated at the rate of time and one-half for all of the overtime he worked. Answer: No.

2) Whether he was terminated in retaliation for complaints he made regarding Defendants' failure to pay him proper overtime. Answer: No.

3) Whether Robert Wilson and Tammy Wilson were corporate officers of Protection. Answer: Yes.

## II. FINDINGS OF FACT

**A.  SABRINA HARPER'S CLAIM**

1.    Sabrina Harper was employed by Professional Protection Specialists, L.L.C., as a Lieutenant for less than two months. She claims that she worked and was not paid for the week of December 9, 2002, and that she was not paid for approximately thirty-seven hours of overtime in January 2003. Defendants contend that Harper did not commence work until the week of December 16, 2002, that she did not work any overtime, that she was an independent contractor, and that if she was an employee, she was exempt from overtime as an executive or an administrative employee.

2.    Harper did not begin work the week of December 9, 2002, as she contends, but rather she began work on December 16, 2002. The Court does not find Harper to be a credible witness. On December 9, 2002, she was in court in connection with a foreclosure proceeding in the Circuit Court of Cook County, Case No. 02 CH 9798. Dx 7 and Px 3 (see calendar entry for December 9, 2002)[1]. This is further corroborated by her failure to claim unpaid wages for the week of December 9, 2002, in her complaint before the Illinois Department of Labor filed on March 4, 2003, in which she claimed unpaid wages for the period of January 16, 2003, through January 31, 2003. Dx 3. There is no reason why she

---

[1]Dx refers to Defendants' exhibits.  Px refers to Plaintiffs' exhibits.

would not have made a claim for the week of December 9, 2002, if she believed that she was not paid for that week.

3.     Harper was paid as a salaried employee on the basis of $700.00 every pay period. The pay periods were the 1st and 15th of each month. She received a check for $550.00 on January 15, 2003, that was reduced by reason of the repayment of a $150.00 loan from Protection. Px 3 (check no. 2210 dated 1/15/03 and check deduction agreement dated December 31, 2002). She received a $700.00 check on January 31, 2003. Dx 6.

4.     Harper did not work more than 40 hours per week. Her purported time sheets are self-serving and were never verified and confirmed by anyone at the company. Px 4. In addition, her time records are totally inconsistent with the time records maintained for her at the company. Px 3.

5.     Harper was an employee of Protection and not an independent contractor. She was hired as a Lieutenant. She was hired to work full-time.

6.     Harper was an executive employee of Protection. She was a Lieutenant who was responsible for up to five work sites. Her duties included supervising security operations on assignment shifts, supervising activities and training of assigned personnel, establishing regular inspections on all accounts and dealing with client issues. Dx 1, 5. She also set up work schedules for guards, met with sergeants and performed administrative duties. She did not perform any guard duties. She was part of Protection's management. Dx 3.

4

## B.   OTIS EMERSON'S CLAIM

7.   Otis Emerson was employed by Protection as a security guard from approximately October 1, 2001, through January 15, 2003. His rate of pay increased during that time from $7.00 per hour to $10.00 per hour.

8.   Protection's time keeping procedures were as follows: once a guard arrived at a site, he would call in to the dispatcher who would stamp in the time. Once the replacement guard reported, the dispatcher would log out the first guard and log in the second guard.

9.   Emerson worked 268 hours of overtime during the period in dispute, January 23, 2001, through June 29, 2002. Px 1, 5. Emerson acknowledges receiving straight time for the overtime he worked. Protection paid Emerson not less than straight time for the overtime he worked. Px 1. Protection has failed to produce sufficient evidence to demonstrate that it paid him time and one-half for all of the overtime. The evidentiary issue was created in part by Emerson's failure to itemize his damages until the day before trial and the failure to provide that information to Defendants as part of the final pretrial order process.

10.   Emerson is owed 268 hours of overtime at $5.00 per hour for a total of $1,340.00. Protection did not knowingly underpay Emerson for his overtime.

11.     On or about December 21, 2002, Emerson was found intoxicated and sleeping on the job at the Robert Taylor Homes by Mr. Wilson, Protection's Vice-President and Henry Nickson, Protection's Field Supervisor. Shortly thereafter, Protection lost its security contract at the Robert Taylor Homes.

12.     Emerson was not called back to work after December 23, 2002, because Protection lost the Robert Taylor contract.

13.     Emerson was requested to turn his badge in on January 15, 2003, at which time he was terminated. Emerson was not terminated in retaliation for complaining about the failure of Protection to properly pay overtime.

14.     Mr. Wilson was a Vice President of Protection. Px 3 (ltr. dated 6/20/03).

15.     Mrs. Wilson was the President and CEO of Protection. Px 3 (ltr. dated 3/28/03).

## III. CONCLUSIONS OF LAW

### A.     JURISDICTION

16.     This Court has federal question jurisdiction founded on 29 U.S.C. § 216(b) and 28 U.S.C. § 1331 over the claims arising under the FLSA. Jurisdiction for the state law claims arises under supplemental jurisdiction. 28 U.S.C. § 1367.

### B.     HARPER WAS AN EMPLOYEE OF PROTECTION, AND NOT AN INDEPENDENT CONTRACTOR

17.     The FLSA does not apply unless there is a valid employer-employee relationship. *See* 29 U.S.C. §§ 206-207. The Act defines an employee as "any individual

6

employed by an employer." *Id.* § 203(e)(1). "Employ" is defined by the Act as to "suffer or permit to work." *Id.* § 203(g). Defendants argue that Harper was an independent contractor for Protection and is not subject to the FLSA. Harper contends that she is an employee and falls within the scope of the Act. The determination of a worker's status is a legal rather than a factual issue. *Karr v. Strong Detective Agency, Inc.*, 787 F.2d 1205, 1206 (7th Cir. 1986). This Court concludes that Harper is an employee under the FLSA.

18. The "economic reality test" is used to determine employment status. *Sec'y of Labor v. Lauritzen*, 835 F.2d 1529, 1534 (7th Cir. 1987); *Karr*, 787 F.2d at 1207. Generally, "employees are those who as a matter of economic reality are dependent upon the business to which they render service." *Lauritzen*, 835 F.2d at 1534 (quoting *Bartels v. Birmingham*, 332 U.S. 126, 130 (1947)). Economic reality of the employment relationship is not derived from one isolated factor, but from all "the circumstances of the work activity." *Hefferman v. Ill. Cmty. Coll. Dist. No. 508*, No. 00 C 079, 2000 WL 631309, at *2 (N.D. Ill. May 16, 2000) (quoting *Sec'y of Labor v. Lauritzen*, 835 F.2d 1529, 1534 (7th Cir. 1987)). The Seventh Circuit describes six factors as a guide when looking at the totality of the circumstances of the work activity. *Lauritzen*, 835 F.2d at 1535. These factors are as follows:

> 1) the nature and degree of the alleged employer's control as to the manner in which the work is to be performed;
> 2) the alleged employee's opportunity for profit or loss depending upon his managerial skill;
> 3) the alleged employee's investment in equipment or materials required for his task, or his employment of workers;

7

4) whether the service rendered requires a special skill;

5) the degree of permanency and duration of the working relationship;

6) the extent to which the service rendered is an integral part of the alleged employer's business.

*Id.* Each factor will be discussed in turn.

### 1. Degree of Employer's Control as to Manner of Work

19. To determine degree of control under the economic reality test, courts focus on what work an employee actually performed and not what work he or she could have performed. *Stone v. Pinkerton Farms, Inc.*, 741 F.2d 941, 943 (7th Cir. 1984). Evidence tends to show control by an employer when it reflects the employer's dominance over the "manner and method" of how work is performed. *Carrell v. Sunland Constr.*, 998 F.2d 330, 332 (5th Cir. 1993).

20. Defendants had full control over their business and every task that Harper was assigned. Protection was organized and operated in a quasi-military fashion with a clear chain of command. Harper was a "Lieutenant" in the organization. Defendants assigned designated tasks to Harper. Although she was permitted to exercise discretion, control remained with the Defendants. *See EEOC v. Century Broad. Corp.*, No. 89 C 5842, 1990 WL 43286, at *3 (N.D. Ill. Mar. 23, 1990) (deeming management to have retained control over radio announcers because broadcasts were supervised by controlling the length of time news broadcasts could run, marketing devices, and even when announcers could announce the time of day). Defendants imposed their expectations on their managers and would fire those who did not meet their expectations. These facts demonstrate that Defendants controlled Harper's manner of work.

### 2. Employee's Opportunity for Profit or Loss Depending Upon Her Managerial Skill

21.     Harper invested nothing in Protection other than her time. She made no financial investment. "An independent contractor risks loss of an investment and has the opportunity to increase profits through managerial discretion." *Id.* at 4 (citing *Lauritzen*, 835 F.2d at 1536). Harper was paid on a salary unrelated to Protection's profit or loss. Regardless of Harper's performance, she would still receive the same bi-monthly salary and did so up until her termination. Any poor work performance by Harper may have led to her termination, but it did not lead to any loss in profit to her. Her job performance did not impact her opportunity for profit or loss.

### 3. Employee's Investment in Equipment or Materials

22.     Harper made no financial investment for any equipment or materials. She was only to receive a salary for the work that she performed.

### 4. Special Skills Required

23.     Harper did not have any special management skills when she was hired. Harper required on-the-job training to develop the skills she needed to perform her required tasks in her short time at Protection. One of Harper's most important tasks was scheduling employee work-time, and Harper was trained by Defendants to do this. Any employee has to develop specialized skills to perform his or her work. *Lauritzen*, 834 F.2d at 1537 (finding that migrant workers had to develop skills to recognize which crops to pick). Yet, "[s]kills are not the monopoly of independent contractors." *Id.* The fact that Harper

9

developed special skills to perform her job does not alter her employment status. Harper was brought in with no management skills and was being trained by Defendants to do her job.

### 5.     Permanency and Duration of the Working Relationship

24.     Harper only worked for a period of six weeks before she was terminated. No contracts existed to define Harper's position or permanency, and Harper was an "at will" employee. However, there is nothing to indicate that both Harper and Defendants did not see the position as permanent at the time Harper was hired. Harper testified that she was being hired to head up two new sites Protection would be acquiring under contract and that it was her intention to perform her job to the best of her capabilities to prove that she could do the work that Protection needed her to do. In *Lauritzen*, migrant workers who did not work year round, but returned from season to season were considered to have enough permanency and duration to be deemed employees rather than independent contractors. 835 F.2d at 1537. The key fact in that case was that the workers returned year after year. *Id.* In this case, Harper and Defendants intended the relationship to be permanent, and this fact is evidenced by Harper's rapid increase in responsibilities during her short time at Protection.

### 6.     Integral Part of Operation

25.     The factor, "integral part of operation," looks at "the nature of the work performed by the workers: does that work constitute an 'essential part' of the alleged employer's business? In other words, regardless of the amount of work done, workers are

more likely to be 'employees' under the FLSA if they perform the primary work of the alleged employer." *Donovan v. DialAmerica Mktg.*, 757 F.2d 1376, 1385 (3d Cir. 1985). Protection is in the business of providing security guards. This is its primary business. Harper was hired as a "Lieutenant" and given the position of Field Supervisor. Harper was responsible for supervising the security guards, making schedules, and being a primary contact between the guards and Protection. In this role, a Field Supervisor basically facilitates the business and makes sure guards are doing their jobs. *See Lauritzen*, 835 F.3d at 1538-39 (deeming migrant pickle pickers to be an integral part of the business because they were necessary in the chain that made the crop available for sale). Without such a person, the business would be very difficult to maintain. Harper was an "essential part" of Defendants' business.

26.     This Court finds, based on the above factors, that Harper was an employee of Protection and falls under the scope of the FLSA.

## C.     HARPER IS EXEMPT FROM OVERTIME PAY UNDER THE EXECUTIVE EXEMPTION

27.     The FLSA does not apply to "any employee employed in a bona fide executive, administrative or professional capacity." 29 U.S.C. § 213(a)(1). Overtime pay is not available to a worker who is exempt under the FLSA. *Demos v. City of Indianapolis*, 302 F.3d 698, 701 (7th Cir. 2002); *Bankston v. Illinois*, 60 F. 3d 1249, 1252 (7th Cir. 1995).

28.     Harper argues that, as an employee of Protection, she should qualify for time and one-half pay for overtime hours that she worked during one week in December 2002 and

11

several weeks in January 2003. Defendants argue that if Harper is deemed an employee then she is exempt from overtime pay available under 29 U.S.C. § 207 as an executive under 29 U.S.C. § 213(1)(a). This Court holds that Harper falls under the executive exemption.

29. The executive exemption can be satisfied in either of two ways, commonly referred to as the Long Test and the Short Test, which are set forth in the regulations promulgated by the Department of Labor. The burden of proof is on the employer to show that an employee falls within one of the exemptions, all of which are to be construed narrowly. *Bankston*, 60 F. 3d at 1252. This Court finds that Harper is an exempt executive under the Short Test.

The Short Test states that

> an employee who is compensated on a salary basis at a rate of not less than $250 per week . . . and whose primary duty consists of the management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof, and includes the customary and regular direction of the work of two or more other employees therein, shall be deemed to meet all the requirements of the [executive exemption].

29 C.F.R. § 541.1(f). The elements of the test are discussed in turn below.

### 1. Compensated on a Salary Basis of $250.00 or More Per Week

30. Harper was paid a salary of $700.00 every two weeks on the 1st and 15th of each month. This is in excess of the statutory minimum requirement of $250.00 per week.

### 2. Primary Duty Is Management of a Customarily Recognized Department

31. The regulations set forth typical examples of management duties. These duties include: (1) interviewing; (2) selecting and training employees; (3) setting and adjusting

employees hours of work; (4) directing employees' work; (5) recommending promotions or other changes in employees' status; (6) handling employees' complaints, grievances, and discipline when necessary; (7) and apportioning work among employees. 29 C.F.R. § 541.102(b). Though not all work duties in this list must be performed, the fewer managerial duties an employee has, the more likely that employee will not be considered a manager. *Dalheim v. KDFW-TV*, 918 F.2d 1220, 1231-32 (5th Cir. 1990).

32. Performing managerial tasks was Harper's primary duty. Harper testified that she was specifically hired to head up two new sites. Further, in her short time at Protection, Harper found herself "in charge of" five sites where she was responsible for making sure that security services were provided. An executive employee's primary duty also may be something of "principal importance to the employer, rather than collateral tasks." *Baudin v. Courtesy Litho Arts*, 24 F. Supp. 2d 887, 893 (N.D. Ill. 1998) (quoting *Reich v. Wyoming*, 993 F.2d 739, 742 (10th Cir. 1993)). Harper performed necessary managerial tasks to enable Protection to provide its services.

33. Harper exercised managerial discretion in the performance of her duties. She was "in charge of" five sites. She was responsible for scheduling employees, interviewing potential employees, requesting disciple for employees, going out to a site if necessary to answer complaints, and sometimes running "Sergeant" meetings. Harper was not directly supervised at all times when she performed these duties. In order to execute the tasks that Harper was required to perform, it was necessary for her to exercise discretion. *See id.* at 893

(finding that Baudin handled several tasks including taking inventory and ordering supplies, and "all of those tasks necessarily involved the exercise of discretion").

34. Even if Harper's executive duties did not take up more than fifty percent of her time, her primary duty was still management, especially because the management duties she performed were more important to the employer than her other work. *Id.* at 892.

### 2. Customary and Regular Direction of Two or More Employees

35. "Customary and regular" means "a frequency which must be greater than occasionally but which, of course, may be less than constant." 29 C.F.R. § 541.107(b). Harper customarily and regularly directed the work of at least two employees. Harper was the first contact the guards had if there was a problem. *See Baudin*, 24 F. Supp. 2d at 893 (noting that workers contacted Baudin if they had questions or concerns about their work). The guards at Harper's sites contacted her directly instead of going to anyone else in the company if they had concerns. Harper was a supervisor to the employees under her, and a direct result of that was that she had multiple employees under her direction.

36. For the foregoing reasons, Harper is exempt under the Short Test. She is not entitled to overtime pay as an executive employee.

## D. EMERSON WORKED OVERTIME HOURS FOR WHICH HE WAS COMPENSATED AT STRAIGHT TIME

37. The FLSA mandates that an employee is entitled to overtime pay at a minimum rate of time and one-half for any hours worked over forty hours per week. 29 U.S.C. § 207(a). It is a longstanding rule that "an employee who brings suit under [Section 217(a) of

the FLSA] for unpaid minimum wages or unpaid overtime compensation, together with liquidated damages, has the burden of proving that he performed work for which he was not properly compensated." *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686-87 (1946). The burden of production shifts to the employer when the employer fails to keep adequate and accurate records. *Id.* at 687.

38.     Courts must give due regard "to the fact that it is the employer who has the duty under § 11(c) of the Act to keep proper records of wages, hours and other conditions and practices of employment and who is in position to know and to produce the most probative facts concerning the nature and amount of work performed." *Id.* at 687. If an employer fails to keep accurate or adequate records, then an employee

> has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence. If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate.

*Id.* at 687-88.

39.     Emerson has met his minimum burden of proof in order to cause the burden of production to shift to Defendants. At trial, undisputed timecards were admitted into evidence to show that Emerson worked a certain amount of overtime hours. Checks were also admitted to show that he was paid each pay period. Emerson testified that he worked 268 overtime hours that were uncompensated at the statutorily required rate of time and one-

15

half. Defendants did not produce all the items employers are required to keep for employees under 29 C.F.R. § 516.2. This was in part due to Emerson's late explanation of his precise damages claim on the eve of trial.

40.    In *Walton v. United Consumers Club, Inc.*, 786 F.2d 303, 314 (7th Cir. 1986), the Court allowed "imprecision in the plaintiff's testimony" to fall on the defendant. In *Walton*, an overtime wage dispute case, "the district court was entitled to credit the testimony that the defendant had instructed plaintiffs not to keep accurate records." *Id.* The defendant had to "suffer the consequences" for any inaccuracy that made it difficult to discover the truth about hours worked because it was defendant's burden to keep accurate records. *Id.* at 314-15. Emerson's case is no different. The Defendants failed to keep accurate records and blamed Emerson for not keeping his pay stubs. The only evidence that pay stubs were ever given to employees was based upon the testimony of Bernata Lowe, Protection's bookkeeper. She testified that pay stubs were given. However, it was clear that Protection no longer used a payroll service to pay its employees and that personal checks were handwritten and given out on payday. Almost all of Emerson's checks were handwritten checks with no information other than the amount paid. There was no information on the checks that showed hours work or any deductions. Defendants did not produce sufficient evidence of what he was paid in correlation with his hours worked. All that was put forward were paychecks with some amount paid to Emerson and timecards for each week worked. This data remains ambiguous.

41. Since Emerson can prove uncompensated work by his testimony, the burden of production shifts to the Defendants to prove "the precise amount of work performed or ... evidence to negative the reasonableness of the inference to be drawn from the employee's evidence." *Anderson*, 328 U.S. at 687. Defendants offered no evidence to explain precisely how Emerson's pay was computed, what rate he was paid for overtime and what deductions were made.

42. Because Defendants were unable to produce the required evidence, the Court "may then award damages to the employee, even though the result be only approximate." *Id.* at 688. Emerson is awarded damages in the amount of $1,340.00. This figure represents the 268 hours of overtime multiplied by $5.00, which is one-half of the premium amount that Emerson was paid during his employment with Protection. Emerson acknowledged receiving his regular hourly rate of $10.00 for the overtime worked.

## E. EMERSON WAS NOT TERMINATED IN RETALIATION FOR COMPLAINTS HE MADE REGARDING DEFENDANTS' FAILURE TO PAY HIM PROPER OVERTIME

43. Under the FLSA, it is unlawful for an employer to "discharge or in any manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this Act." 29 U.S.C. § 215(a)(3). Emerson argues that he was fired from Protection in retaliation for complaining to his superiors that he was not receiving proper overtime pay. Defendants argue that Emerson was fired because no more work was available and for poor job performance;

specifically, he was found drunk and passed out while on duty. This Court holds that Emerson failed to prove retaliatory discharge, and that his termination was not in any way related to the issue of claims by him regarding overtime pay.

44.     Protection lost its "Robert Taylor" contract which was the site where Emerson was employed. Emerson was told on December 31, 2002 that there was no more work available and he was not scheduled up until his official termination on January 15, 2003. It is a legitimate reason to fire employees if there is no work available for them. In addition, Emerson had a history of poor job performance which was also a contributing factor in the decision to terminate him.

## F.     DEFENDANTS MR. AND MRS. WILSON ARE PERSONALLY LIABLE FOR EMERSON'S OVERTIME WAGE CLAIM

45.     This Court has already found Mr. and Mrs. Wilson to be corporate officers of Protection. Further, Protection as an entity is liable to Emerson for his wage dispute. Corporate officers may be held personally liable "for the corporation's statutory wage obligations," and the FLSA is given a broad interpretation on this point. *Scarbrough v. Perez*, 870 F.2d 1079, 1082 (6th Cir. 1989). Emerson has named both Robert and Tammy Wilson, along with Protection, as individual defendants in this case. Protection and its officers had an obligation to ensure that Emerson was paid properly for the overtime that he worked. This Court finds that both Robert and Tammy Wilson are personally liable, along with Protection, for Emerson's overtime claim.

## G.  STATE LAW CLAIMS

46.  Plaintiffs Harper and Emerson also brought their overtime wage claims under an Illinois state law cause of action.  820 ILCS 105/1-15.

47.  This Court finds that Harper has failed to satisfy her state law overtime claim because an employee who is deemed an a bona fide executive under the FLSA is exempt from overtime under the Illinois statute.  802 ILCS 105/4a(2)(E).

48.  Emerson has satisfied his Illinois state law claim for overtime.  The Illinois statute, like the FLSA, requires that adequate records be kept by the employer.  820 ILCS 105/8.  It has already been established that Defendants have failed to keep and to provide adequate records to disprove Emerson's overtime claim.

## IV. CONCLUSION

For the reasons set forth in this opinion, judgment is entered in favor of Defendants, Robert Wilson, Tammy Wilson and Professional Protection Specialists, L.L.C., and against Plaintiff, Sabrina Harper on all of her claims in her amended complaint.  Judgment is entered in favor of Plaintiff, Otis Emerson, and against Defendants Robert Wilson, Tammy Wilson, and Professional Protection Specialists, L.L.C., in the amount of $1,340.00 for his claim for overtime pay, and in favor of Defendants and against Plaintiff, Otis Emerson, for his claim of retaliatory discharge in the amended complaint.  Each party shall bear its own court costs.

**SO ORDERED THIS 12th DAY OF FEBRUARY, 2004.**

_Morton Denlow_
_____
**MORTON DENLOW**
**UNITED STATES MAGISTRATE JUDGE**

**Copies mailed to:**

Ernest T. Rossiello
ERNEST T. ROSSIELLO & ASSOC.
134 N. LaSalle Street
Suite 2008
Chicago, IL 60602-1137

Alan Rhine
LAW OFFICES OF ALAN RHINE
111 W. Washington Street
Suite 1025
Chicago, IL 60602

**Counsel for Plaintiffs**

**Counsel for Defendants**